# In the United States Court of Federal Claims

No. 18-1566C
(Filed: December 11, 2018)
(Re-Filed: February 5, 2019)[1]

* * * * * * * * * * * * * * * * * * * * * * * * *

SYNAPTEK, INC.,

      *Plaintiff*,

v.

THE UNITED STATES,

      *Defendant*,

and

OPEN SAN CONSULTING, LLC,

      *Intervenor*.

Bid protest; post-award bid protest; FAR 15.308 (2018); FAR 9.105-2(a)(1) (2018); best value determination; price reasonableness; responsibility determination.

* * * * * * * * * * * * * * * * * * * * * * * * *

    *Jerry A. Miles*, Rockville, MD, for plaintiff, with whom was *Christine Funk*.

    *Reta Emma Bezak*, Trial Attorney, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, with whom were *Joseph H. Hunt*, Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, *Deborah A. Bynum*, Assistant Director, for defendant. *Theresa S. Keenan*, Department of the Navy, NAVSUP FLC Norfolk, assistant counsel.

---

[1] This opinion was originally issued under seal to permit the parties an opportunity to propose redactions on or before February 4, 2019. The government and intervenor proposed redactions on February 4, mooting intervenor's December 31, 2018 motion to redact. Plaintiff did not file proposed redactions. We thus adopt defendant's and intervenor's agreed-upon redactions.

*Matthew Moriarty*, Lawrence, KS, for intervenor.  *Matthew T. Schoonover*, *Steven J. Koprince*, and *Haley E. Claxton*, of counsel.

## OPINION

BRUGGINK, *Judge*.

This is a post-award bid protest by Synaptek, Inc. ("Synaptek"), of an award by the United States Department of the Navy, NAVSUP Fleet Logistics Center ("the Navy"), of a contract for information technology ("IT") support services for the National Defense University ("NDU") to Open SAN Consulting, LLC ("OSC").

The parties filed cross-motions for judgment on the administrative record. The matter is fully briefed, and we held oral argument on December 6, 2018. Because the Navy properly documented its award and its analysis was reasonable, we grant defendant's and intervenor's motions for judgment on the administrative record and deny plaintiff's motion.

## BACKGROUND

The Navy issued a small business set-aside solicitation to procure IT services for the NDU, intending to award a single, firm fixed price, indefinite delivery, indefinite quantity type contract to the responsible offeror who represented the best value to the government. The Navy planned to award a contract without discussions and reserved the right to award the contract to an offeror who was not the lowest priced offeror.

The Source Selection Evaluation Board ("SSEB") would consider the following factors, listed in descending order of importance: Management Approach, Performance Approach, and Past Performance. Management Approach and Performance Approach were rated Unacceptable, Marginal, Acceptable, Good, or Outstanding. Past Performance was rated No Confidence, Limited Confidence, Neutral Confidence (or Unknown Confidence), Satisfactory Confidence, or Substantial Confidence. To be eligible for award, an offeror had to be rated at least Acceptable overall. The Source Selection Authority ("SSA") would evaluate price for reasonableness.

The Navy received twelve proposals. The SSEB determined that four offerors were eligible for award, listed from first to last place: Synaptek, OSC, [          ], and [   ]. The SSEB rated Synaptek Outstanding and rated OSC Good. [                                               ]

OSC was rated Outstanding on Management Approach, Good on Performance Approach, and Unknown Confidence on Past Performance. On Management Approach, the SSEB determined that OSC provided "multiple strengths, and risk of unsuccessful performance is low." Administrative Record ("AR") 522. For Task 5.1 Program Management, the SSEB assigned OSC a strength based on OSC's "management program managed by a long term Project Manager and [                          ]." *Id.* It also assigned OSC strengths for Task 5.1 for its "holistic 11 area project management methodology," "a proprietary [                                                    ]," and "program management methodology." *Id.* The SSEB assigned strengths to OSC for the rest of the Management Approach tasks but noted that OSC's proposal only marginally addressed anticipated risks. Overall, the SSEB found that OSC presented a "well-constructed, logical and efficient strategy" for its Management Approach and its multiple strengths outweighed the single risk. AR 525.

On Performance Approach, the SSEB determined that OSC presented a "thorough approach to Program Management, Cyber Security and Transition." AR 528. OSC's weakness was Task 5.6 Technology Planning and Modernization, where the SSEB determined that OSC "does not provide specifics on how the offeror will embark on the evaluation and identification of the needs of the organization." AR 526-27. The SSEB nevertheless determined that OSC "did illustrate an understanding and of approaches to modernization in other areas of the document . . . and this is considered adequate." AR 527. The SSEB also noted that OSC did not address certain memorandums to record under Cyber Security. The SSEB found that due to OSC's "empowered management style," "appropriately addressed" Cyber Security, and "strong transition plan," OSC had demonstrated "a well-constructed, effective approach." AR 528.

OSC presented three references for Past Performance; each was "Somewhat Relevant." AR 531. The SSEB nevertheless ranked OSC "Unknown Confidence (Neutral)" because OSC's "performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned." AR 532. Although it had performed in a DoD environment,

because OSC had not performed in a DoD educational environment, OSC did not demonstrate similar complexity. The SSEB noted that OSC's references "indicated a customer focused management that met or exceeded timelines, and provided forward facing staff which exceeded quality metrics." AR 533.

The SSEB rated Synaptek Outstanding on both Management Approach and Performance Approach and rated it Substantial Confidence on Past Performance. Regarding Management Approach, the SSEB determined that Synaptek's proposal was exceptional, noting, however, that its approach to managing its subcontractor performance and its assessment of risks in undertaking this project were thorough rather than exceptional. Synaptek's Management Approach, overall, "contained multiple strengths which lend toward low risk effective performance." AR 537.

Regarding Performance Approach, the SSEB found that Synaptek's approach was exceptional except for Cyber Security Support, which was thorough. Synaptek's Transition-In Plan was exceptional in part because GDIT, the incumbent, is a proposed subcontractor for Synaptek.

Synaptek offered three references, one of which was "Very Relevant" while the other two were "Somewhat Relevant." AR 542. Its first reference indicated that it was a subcontractor on the incumbent contract and therefore it had similar experience. Overall, the SSEB had a "high expectation that Synaptek will successfully perform the required effort." AR 543.

In its summary, the SSEB wrote that both OSC and Synaptek received Outstanding for the most important factor, Management Approach. "[T]he Synaptek approach [is] slightly superior as there were no weakness[es] in the Synaptek Management Approach while the OSC Edge approach contained a significant weakness in risk component." AR 545. Likewise, Synaptek was rated higher than OSC on Performance Approach, because it did not have any weaknesses compared to OSC's Technology and Modernization weakness. Finally, although both "received strong feedback, touting high quality service[] levels and a strong customer focus," Synaptek was rated Substantial Confidence whereas OSC was rated Unknown Confidence. AR 546.

Before heading into the SSA's price evaluation and best value determination, Synaptek and OSC held first and second place, respectively, with [     ] and [     ] the final two acceptable offerors. The price

4

proposals of all offers ranged from a low of $35,185,276 to a high of $79,912,424. The range of acceptable offers included the following price proposals:

| Offeror | Non-Price Rating | Total | Price above Low | Non-Price Ranking |
|---|---|---|---|---|
| [     ] | [     ] | [     ] | LOW | 4 |
| **OSC** | Good | $44,290,359 | [     ] | 2 |
| [     ] | [     ] | [     ] | [     ] | 3 |
| **Synaptek** | Outstanding | $62,009,284 | [     ] | 1 |

AR 567.

The total difference between Synaptek and OSC is $17,718,925.

For the SSA's price analysis, offerors provided fully burdened labor hour rates for 32 labor categories, 75% of which were performed in DC, 20% performed in Norfolk, Virginia, and 5% performed at the contractor site for the five-year ordering period. The price competition was in accordance with Federal Acquisition Regulation ("FAR") 15.404-1(b)(2)(i) (2018) and the SSA deemed that section satisfied because two or more responsible offerors, competing independently, submitted price offers. The SSA compared the total proposed price of the offerors. She then used a comparative analysis to determine which proposal represented the best value, considering the "[n]on-price proposal more important than the offeror's price proposal." AR 566. The SSA concluded that OSC, "as the offer ranked second from a non-price standpoint and although slightly higher than the lowest price [ ] offer[,] . . . is determined to represent the best value to the Government, price and other factors considered." AR 567.

The SSA began by explaining that "[p]otential contributors to the price delta" between the eligible offerors' prices include "the fact that direct labor rates and indirect cost pools are individual to each company . . . ." AR 568. Additionally, because each of the labor categories in the solicitation

5

permitted equivalency offsets for education and experience, the solicitation allowed for "a good deal of flexibility in the development of resource pools to satisfy the requirement and thereby contributes to the price delta among the offerors." *Id.* The SSA determined OSC's price to be fair and reasonable in comparison to the other prices.

Next, the SSA compared OSC's price to "prices being paid for similar services under the predecessor Task Order." *Id.* For "Change Manager" and "Cyber Security Specialist," OSC's price was [ ] and [ ] higher than the historical data. For all other labor categories, OSC's price was lower, ranging from [ ] to [ ] for an average of [ ] lower than the historical data. The SSA explained that the difference was at least in part attributable to the use of "published GSA Alliant rates" when actual rates were not available. The SSA found that OSC's rates compared favorably to the prior contract.

The SSA also compared OSC's price to prices obtained through data from the Bureau of Labor Statistics and an industry survey. She compared not only OSC's price to that metric but also [ ]'s lower price. The SSA found that OSC's rate was favorable and that its lower price may be attributable to the use of the Bureau's hourly mean wage rate, from which there could be variance above or below.

Finally, the SSA compared OSC's price to the Independent Government Estimate ("IGE"). The IGE was $74,158,350, primarily calculated using the median GSA Alliant rates, which are drawn from more than fifty companies. The GSA Alliant rates contain "a wide range of labor category pricing, which results in varying pricing [from] the offerors." AR 573. Because the GSA Alliant rates were higher than even the incumbent's published rates and had used a slightly higher than market escalation rate, the SSA discounted the helpfulness of the IGE. She assumed that "the environment of the instant acquisition maximized competitive behavior techniques relative to preparation of proposals." *Id.* She acknowledged that OSC was lower than the comparative prices but concluded that its price was reasonable.

After this comparison, the SSA conducted the best value determination. She began by acknowledging that OSC was ranked second to Synaptek on the technical factors. The SSA compared OSC's and Synaptek's performance on the individual factors. For Management Approach, the most

6

important factor, she noted that Synaptek demonstrated no weaknesses whereas OSC demonstrated one weakness for failure to specifically identify risks and mitigation techniques. She wrote that "Synaptek was slightly superior to OSC," even though both offerors were rated Outstanding. AR 575. For Performance Approach, the SSA reviewed both offers and concluded that Synaptek "is considered superior to" OSC even though both offerors presented multiple strengths. *Id.* Synaptek provided a better Technology and Modernization plan than OSC, but the SSA noted that OSC "appropriately addressed" each area of Cyber Security. *Id.* Finally, on Past Performance, Synaptek was also the technically superior offeror, "[d]ue to the strong feedback on the very relevant reference" to the incumbent contract. *Id.* OSC did not provide a very relevant reference even though OSC's experience "demonstrated similar scope and magnitude when viewed in the aggregate." *Id.* The SSA found that OSC's primary weakness was lack of experience in a DoD educational environment, despite its experience in other DoD environments.

The SSA concluded that Synaptek is "the technically superior proposal when compared to OSC Edge based on its slightly superior Management Approach and its superior Performance Approach and Past Performance." AR 576. The SSA noted, "However, Synaptek's price is 40.1% higher than the OSC Edge proposed price." *Id.* She explained why Synaptek's premium was not the best value to the government:

> Although the Synaptek Management Approach was determined to be slightly superior in the area of risk identification[,] the OSC Edge Management Approach was nonetheless considered Outstanding, offering a well-constructed, efficient strategy for performance. The Performance Approach of Synaptek was considered Outstanding, with multiple strengths; the OSC Edge was considered Good, with multiple strengths which offset a weakness in the Technology and [M]odernization area. The Past Performance of Synaptek was rated Substantial Confidence, providing the incumbent reference for which above satisfactory performance was supported. OSC Edge provided references which were considered somewhat relevant in the aggregate; however, the references met the scope and magnitude of the requirement but lacked one component of the

7

> complexity of the educational environment. Strong feedback was received on the references. Despite a rating of Unknown Confidence (Neutral) in Past Performance, it is noted the rating stems from the lack of one component of complexity, but otherwise meets the requirements. This, along with the strong feedback [that] was obtained from the references, limits the risk associated with the Neutral rating. OSC Edge received the highest rating for the most important factor, a Good rating for the second most important factor, and the strong feedback in Past Performance. Therefore, the non-price superiority of the offer submitted by Synaptek does not warrant a price premium of 40.1% (or $17,718,925).

*Id.*

The SSA then compared OSC's offer to the two Acceptable offerors. The SSA determined that "OSC Edge's proposal is superior to [ ] based on OSC Edge's multiple strengths . . . ." *Id.* "Both offerors received a rating of Unknown Confidence in Past Performance, primarily due to the lack of the complexity component of performance in an educational environment, thereby rendering the ratings approximately equal." *Id.* She concluded, "As [       ] was ranked below OSC from a non-price standpoint, with the OSC considered superior to [        ] in two of the three evaluation factors, and priced 20.9% higher than OSC, award to [         ] would not be the best value to the Government." *Id.*

Likewise, OSC was ranked technically superior on Management Approach and Performance Approach compared to [    ]. The SSA found that "[a]lthough OSC Edge is priced 2.68% higher than [   ], the strengths in the OSC Edge non-price proposal, particularly in the areas of Cyber Security, management of personnel qualifications and transition support the nominal price difference between OSC Edge and [    ]." AR 577.

The SSA concluded that OSC's performance risk is low:

> While the Technical Evaluation labeled OSC Edge's Past Performance a rating of Unknown/Neutral, indicating a performance record that is so sparse that no meaningful confidence assessment rating can be reasonably assigned, the SSA reviewed the underlying details of the technical evaluation and references OSC Edge provided and considers

> OSC Edge's Past Performance to be more appropriately rated Satisfactory Confidence, indicating the Government has a reasonable expectation that the offeror will successfully perform the required effort.

*Id.*

The SSA concluded that OSC could overcome its lack of work in a DoD educational environment since it had performed in "multiple DoD environments . . . giving the SSA a reasonable expectation that OSC Edge would be able to adapt to the educational environment and perform satisfactorily. Furthermore, OSC Edge performance met or exceeded all quality metrics under the references." AR 577-78. The SSA wrote that OSC had been determined responsible and that its price was fair and reasonable. After consideration of the non-price and price factors, the SSA recommended award to OSC.

The Navy identified OSC as the apparent awardee on November 22, 2017. Synaptek filed a size protest on November 14, which the SBA denied. Synaptek next filed a protest at the agency on December 13 while simultaneously appealing the SBA's denial of its size protest. The Navy dismissed the agency protest as premature on January 3, 2018. The SBA OHA denied Synaptek's appeal.

The Navy awarded the contract to OSC on January 5, issuing a bridge contract to the incumbent, GDIT, through February 28 to allow time for transition to OSC. Synaptek and Envistacom [

      ] filed GAO protests on January 15 and 16, 2018. GAO dismissed these protests as premature, because the Navy had not yet given debriefings.

The Navy delivered debrief letters on January 31 and both offerors filed GAO protests on February 5. GAO dismissed a portion of Synaptek's protest but directed the Navy to respond to certain allegations.

On February 28, 2018, the Navy issued another bridge action to GDIT for performance through July 31. On March 1, the Navy notified GAO that it intended to take corrective action regarding the Envistacom and Synaptek protests. GAO dismissed the protests on March 8.

For corrective action, the Navy determined that Envistacom's allegations warranted reevaluation by the SSEB of Envistacom's proposal. The SSA reviewed Synaptek's allegations and determined that SSEB

reevaluation of Synaptek's and OSC's proposal was not necessary, but the SSA did choose to consider Synaptek's allegations in detail in her second source selection decision. Ultimately, the SSEB's reevaluation of Envistacom did not change the Navy's determination of offerors eligible for award. After review of Synaptek's protest allegations, the SSA agreed that two positive aspects of OSC's evaluation should be changed, but that those two changes did not alter OSC non-price factor ratings or its overall rating.

In the second source selection decision, the SSA repeated the summary of each proposal before returning to the price analysis. The SSA added two price comparison components in the source selection decision. First, the SSA compared "the average fully burdened rate of the bridge action" to "the average proposed fully burdened rate of the instant acquisition." AR 656. She divided "the estimated price by the labor hours for both the existing contract and the proposed acquisition." *Id.* She found that OSC's "average fully burdened rate for the instant acquisition is [ ] . . . which is [ ] lower than the existing bridge rates," [ ]. *Id.* The SSA reasoned that, due to factors such as GDIT's [ ] pass through rate, equivalency offsets, and a competitive environment, OSC's price was reasonable. *Id.*

The SSA also added a direct comparison of OSC and Synaptek. OSC's price "is less than, or within a [ ] delta of the proposed Synaptek price for approx. [ ] of the proposed labor categories. In addition, there is a [ ] delta between the proposed OSC Edge price and the Synaptek price for the Operations Manager labor category." *Id.* The SSA explained that the current solicitation reduced the Operations Manager requirements and this reduction contributed to the price difference. The SSA noted that the equivalency offsets permitted "a good deal of flexibility in the development of resource pools to satisfy the requirement and thereby contributes to the price delta among the offerors." *Id.* The SSA wrote that the Navy anticipated offers to create a variety of structures for their labor category proposals. The SSA again acknowledged that OSC price was lower than Synaptek's but found OSC's price fair and reasonable.

Finally, the SSA reviewed Synaptek's allegations regarding OSC's deficiencies. The SSA adjusted OSC's rating in two respects. First, the SSA reviewed the SSEB's evaluation of OSC's Management Approach. Synaptek alleged that OSC impermissibly had failed to indicate a permanent Program

10

Manager and that OSC's transitional, independent consultant Program Manager created operational risk.

The SSA found that the solicitation included a Program Manager labor category, but that OSC was not required to appoint a permanent representative at the outset. OSC should have identified that program manager as a consultant, but the SSA did not find OSC's failure to disclose material. The SSA removed OSC's assigned strength for a long-term Project Manager. Since OSC had at least three other named strengths under Management Approach and because the [

] went beyond the solicitation's requirements, the SSA determined that the removal of one strength did not warrant downgrading OSC from Outstanding for Management Approach.

Second, Synaptek alleged that OSC's Past Performance was overrated, because "[t]he SSEB determined that OSC Edge demonstrated similar scope and magnitude when viewed in the aggregate but not similar complexity." AR 662. The SSA reviewed OSC's references and agreed with Synaptek that the original assessment was incorrect. OSC proposed to perform 56.5% of the work and only one of its references listed OSC as the prime contractor performing the work. That contract involved one of the task areas implicated by the solicitation and was [ ] of the magnitude of the solicitation. Therefore, OSC's references were not of similar scope, magnitude, or complexity. The quality of the performance and reviews provided were satisfactory, however. The SSA found that the adjustment to how OSC's references were viewed in the aggregate did not change the Unknown Confidence rating. The SSA "acknowledge[d] that OSC's Past Performance does create some risk and this is reflected in the best value trade off section below." AR 662.

The SSA did not make changes based on Synaptek's remaining allegations. Synaptek argued that OSC's proposal to [

] created staffing risk. The SSA disagreed, noting that the [

] was permissible and in fact contributed to the strength of OSC's plan.

Synaptek also alleged that OSC would not be able to hire or retain personnel with the required cyber security qualifications. The SSA reviewed OSC's proposal and the SSEB's evaluation and found that OSC had not departed from the solicitation and that its Staff Management Database

appeared capable of ensuring qualified staff. The SSA noted that, if OSC failed to retain qualified staff, it would be a contract administration issue.

Synaptek also critiqued OSC's ability to comply with the subcontracting limitation. The SSA's review satisfied her that OSC had proposed its subcontractors properly, explained their role in OSC's performance, and proposed appropriate monitoring to ensure compliance with the subcontracting limitation. The SSA noted that actual noncompliance during performance was a contract administration issue.

Finally, Synaptek alleged that OSC's Performance Approach was overrated. The SSA found this allegation to be vague, but nevertheless reviewed the SSEB's evaluation and determined that an adjustment was not warranted.

In the SSA's new best value determination, OSC was in second place, even after considering "the noted changes to the evaluation made by the SSA through the corrective action." AR 664. The SSA incorporated the changes to OSC's strengths into the best value analysis and determined, once again, that Synaptek was "slightly superior" to OSC on Management Approach, "superior" on Performance Approach, and "far superior" on Past Performance. AR 665-66. The SSA's conclusion relied on the comparisons between Synaptek and OSC:

> Synaptek is considered to be the technically superior proposal when compared to OSC Edge based on its slightly superior Management Approach and its superior Performance Approach and far superior Past Performance. However, Synaptek's price is 40.1 % higher than the OSC Edge proposed price. Although the Synaptek Management Approach was determined to be slightly superior in the area of risk identification; the OSC Edge Management Approach was nonetheless considered Outstanding, offering a well-constructed, efficient strategy for performance. The Performance Approach of Synaptek was considered Outstanding, with multiple strengths; the OSC Edge was considered Good, with multiple strengths which offset a weakness in the Technology and modernization area. The Past Performance of Synaptek was rated Substantial Confidence, providing the incumbent reference for which above

outstanding performance was supported. OSC Edge was rated Unknown Confidence (Neutral) in Past Performance, primarily based on the lack of similar references by OSC Edge as the prime contractor. Despite Synaptek's proposal being technically superior to OSC Edge, it is determined that the non-price superiority of the offer submitted by Synaptek does not warrant a price premium of 40.1 % (or $17,718,925). The Government acknowledges that OSC Edge provides an increased risk of performance when compared to Synaptek, largely as a result of the Past Performance factor, and that the solicitation stated that the non-price proposal is more important than the offeror's price proposal, however, the price premium to Synaptek is too significant. OSC Edge received the highest rating for the most important factor, a Good rating for the second most important factor, and an Unknown/Neutral rating for Past Performance indicating that OSC Edge has the ability to perform albeit with a moderate risk of performance.

AR 666.

The SSA also compared OSC to [    ] and to [    ] again, reaching the conclusion that OSC remained the superior offeror. The SSA increased OSC's level of performance risk to "moderate," but recommended award to OSC. AR 668.

After the Navy awarded the contract to OSC, Synaptek protested once again at GAO. GAO ultimately denied the protest, finding that the Navy reasonably determined that OSC would adhere to the subcontracting limitation and that the Navy's best value tradeoff was reasonable.

Synaptek filed its complaint in this court on November 9, 2018.

## DISCUSSION

Synaptek advances three arguments: that the Navy turned the best value determination into an award to the lowest price technically acceptable offeror; that the Navy's evaluation of OSC's technical proposal was unreasonable; and that the Navy's responsibility determination lacked a

rational basis and was not documented properly.[2] Our review of the Navy's decision considers whether it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. . . ." 5 U.S.C. § 706 (2018); 28 U.S.C. §1491(b)(4) (2018).

The present solicitation sought the best value for the government from among the eligible proposals. "'Best value' means the expected outcome of an acquisition that, in the Government's estimation, provides the greatest overall benefit in response to the requirement." FAR 2.101. The government may use a best value tradeoff analysis "when it may be in the best interest of the Government to consider award to other than the lowest priced offeror or other than the highest technically rated offeror." FAR 15.101-1(a). When making the best value determination, the SSA must use her "independent judgment" to decide "based on a comparative assessment of proposals against all source selection criteria in the solicitation." FAR 15.308. The SSA must document her decision, including "the rationale for any business judgments and tradeoffs made or relied on by the SSA, including benefits associated with additional costs. Although the rationale for the selection decision must be documented, that documentation need not quantify the tradeoffs that led to the decision." *Id.*

A plaintiff seeking to disturb the SSA's best value determination bears a significant burden, because the SSA has a high degree of discretion in determining which proposal offers the best value to the government. *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004); *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996).

I. The SSA's Price Analysis and Best Value Determination

Before turning to the SSA's best value determination, we note that the common thread running through Synaptek's arguments is that OSC's price

---

[2] Synaptek's argument on its motion for judgment on the administrative record omitted certain arguments raised in its complaint: (1) the Navy unreasonably rated OSC's price proposal because OSC's price proposal is unrealistically low; (2) the Navy unreasonably determined that OSC is able to comply with the limitation on subcontracting rule; (3) the Navy unreasonably failed to conduct corrective action; and (4) GAO's summary dismissal prejudiced Synaptek. As if still advanced, we have considered those arguments, and we find that none of these arguments warrant granting Synaptek's motion.

proposal is too low to realistically guarantee that the Navy will reap the benefits promised in OSC's proposal. Synaptek does not contend that the price analysis itself violated the FAR but rather that it was irrational to believe OSC's price is reasonable. The SSA here was required to review the prices for reasonableness, not realism, and we must be careful not to conflate the standards. *See* AR 24. The SSA considered the reasonableness of OSC's price in comparison to the other offerors, Synaptek's price, the prior contract, the bridge contract, the IGE, and market data. It is true that OSC's price was lower than each of these data points, but the SSA did not ignore that fact. Instead, the SSA explained why she believed OSC's price was lower than each of the comparison prices. Given that the SSA gave logical reasons why OSC's price could be lower than the others and explained why certain data points did not provide an accurate comparison, we see no reason to determine that her analysis was irrational.

Turning to the best value analysis, Synaptek argues that the Navy prioritized price over the technical factors in its best value tradeoff, violating the terms of the solicitation by swapping a best value tradeoff for a lowest price technically acceptable analysis. We disagree. The best indicator that the SSA performed a best value analysis is the fact that the SSA recommended OSC, not [ ], for award. [ ] had the lowest price proposal and was rated Acceptable. OSC, on the other hand, was more expensive than [ ], rated Good rather than Acceptable, and was technically superior to both [ ] and [         ].

Furthermore, price was a factor, even though it was less important than the technical factors. The best value analysis must take price into account when it is an evaluation factor and the SSA is required to document the "benefits associated with additional costs." FAR 15.308. Here, the SSA properly considered whether Synaptek's plan warranted $17 million in additional costs when compared to a "Good" proposal from an offeror whose primary disadvantage was not having operated in the NDU educational environment. The SSA's determination that OSC offered the best value to the Navy is an example of the government's flexibility "to consider award to other than the lowest priced offeror," [ ], "or other than the highest technically rated offeror," Synaptek. FAR 15.101-1(a).

Synaptek also contends that the SSA's source selection decision was conclusory, drawing comparisons to *First Line Transp. Sec., Inc. v. United*

*States*, 100 Fed. Cl. 359, 382-84 (2011) and *Femme Comp Inc. v. United States*, 83 Fed. Cl. 704, 757-770 (2008).

In *First Line*, "[o]n a short form attached to the SSEB recommendation, the SSA stated that '[a]fter consideration of the information provided to me by the technical and price evaluation members and after accomplishing an independent review and assessment of the technical and price consensus reports, I hereby determine that AKAL Security is the best value offer solution by utilizing the trade-off method.'" 100 Fed. Cl. at 383. Unlike a single form with no explanation, the SSA here explained her thought process. Particularly in the post-corrective action source selection decision, the SSA's decision reflects a judgment that at points diverges from or corrects the SSEB's recommendations and that compares OSC not only to the technically superior offer but also to the other two eligible proposals.

Moreover, unlike the SSA in *Femme Comp Inc.* who adopted a flawed SSEB technical evaluation and minimized or conflated the difference between offerors, here in both the original and the post-corrective action source selection decision, the SSA repeatedly acknowledged Synaptek's technical superiority, which ranged from "slightly" to "far more" superior than OSC. *See* 83 Fed. Cl. at 757-770. The SSA directly compared the two offerors on each technical factor. She weighed the increased risk attributable to OSC but found that when the technical superiority of Synaptek was coupled with its 40.1% price premium, the Navy was prepared to bear the additional moderate risk associated with OSC's offer that had multiple strengths, few weaknesses, and the preferable price. Synaptek believes the SSA should have "quantif[ied] the tradeoffs" that led to choosing OSC, which is detail that the FAR expressly states the SSA is not required to include. FAR 15.308. We agree that the SSA could have made a more detailed analysis, but the SSA's decision is properly documented.

II. Technical Proposal

Regarding the technical proposal, Synaptek makes a variety of arguments that OSC was overrated on the first two factors and that the Navy ignored risks that it should have considered in OSC's technical proposal. First, Synaptek argues that the Navy did not consider the risk that OSC would not be ability to execute its proposal. The SSA did consider OSC's ability to execute its approach, however. *See* AR 659-62. In the corrective action, the

SSA reviewed OSC's proposal for all the weaknesses that Synaptek alleged and found that the materials OSC provided indicated that it could perform successfully, albeit with some risk. Synaptek's doubts notwithstanding, the SSA considered Synaptek's allegations.

Synaptek also argues that OSC's failure to propose a full-time Program Manager should have resulted in an assigned weakness. We disagree.

The solicitation required the contractor to "provide a Program Manager (PM) as a primary point of contact who shall provide management, direction, administration, quality control, and leadership of the execution of any TO." AR 47. The program manager would "serve as the Government's major point-of-contact," "provide overall leadership and guidance for all contractor personnel," and be "ultimately responsible for the quality and efficiency" of performance. AR 68. Additionally, "[t]he PM shall have organizational authority to execute the requirements. The PM shall assign tasking to contractor personnel, supervise on-going technical efforts, and manage overall task order performance." AR 68. The solicitation does not require a single, permanent program manager for the duration of the contract. OSC named a Program Manager, [            ], AR 260, thus meeting the Program Manager requirement. Synaptek seizes on the word "on-going," but OSC does not suggest that its Program Manager will not continually supervise technical efforts.

The SSA considered the fact that OSC may present risk due to replacing Mr. [    ] after the transitional period. She also accounted for OSC's proposal of a [            ] that was not required by the solicitation. Synaptek's disagreement with the SSA's reasonable assessment that OSC's Program Manager approach will be effective is insufficient to demonstrate the decision was arbitrary and capricious or irrational.

Synaptek also argued that the Navy overrated OSC's Performance Approach. Synaptek does not actually challenge the content of OSC's proposal, however. Instead, it casts aspersions on OSC's finances, citing materials that were not before the Navy at the time of the SSEB's or the SSA's evaluation and that we decline to consider. Synaptek does not connect the dots as to why the Navy should have abandoned the written proposals and sought additional information when the solicitation expressly provided that the Navy would not hold discussions.

Synaptek's related argument that OSC's Performance Approach is overrated because its employees will not have the required certifications is without support in the record. OSC's proposal spelled out its process for maintaining certified employees, explained its subcontractors' roles, and warranted that its employees would be properly credentialed. Synaptek may disagree, but without more its allegations are insufficient to disturb the Navy's award.

The last component of Synaptek's argument that OSC's Performance Approach should not have been rated "Good," is that the Navy ignored the serious risk that OSC will pay its employees at below-market rates. This argument is another iteration of Synaptek's disbelief that an offeror at a price point significantly lower than its own could perform the requirements of the contract. Synaptek merely presents an alternative way to view the IGE and market cost data, which that the SSA viewed differently. But Synaptek does not meaningfully challenge the SSA's explanations for how OSC's price reasonably could differ from the comparison prices.

OSC made representations in its proposal, on which the SSA was entitled to rely, and among those statements was an explanation of how it offered competitive employment packages that include more than the base salary. In any event, OSC was in the middle of the range of prices for offerors overall and slightly lower than the middle of prices from eligible offerors. The SSA's adoption of the Good rating for Performance Approach was not unreasonable.

### III. Responsibility Determination

Finally, Synaptek argues that the Navy did not properly document its responsibility determination and, in any event, could not have determined rationally that OSC is a responsible offeror. "The contracting officer's signing of a contract constitutes a determination that the prospective contractor is responsible with respect to that contract." FAR 9.105-2(a)(1) (2018). Contracting officers "are 'generally given wide discretion' in making responsibility determinations and in determining the amount of information that is required to make a responsibility determination." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1335 (Fed. Cir. 2001) (quoting *John C. Grimberg Co. v. United States*, 185 F.3d 1297, 1303 (Fed. Cir. 1999)). The court will afford the agency's determination of responsibility the presumption of regularity until the

protestor rebuts the determination with evidence that demonstrates that the determination was arbitrary and capricious. *Id.*

The contracting officer signed the award of the contract to OSC. AR 780. Moreover, the contracting officer included a checklist responsibility determination in her Contract Review Board Presentation after corrective action. AR 628. Synaptek has not demonstrated that the agency ignored relevant information that was before it or pointed to information that the Navy should have sought out that would have disqualified OSC. We will not disturb the Navy's exercise of discretion in determining OSC a responsible offeror.

## CONCLUSION

In sum, because the Navy properly awarded the contract to OSC, we grant defendant's and intervenor's motions for judgment on the administrative record and deny plaintiff's motion. The Clerk is directed to enter judgment for defendant. No costs.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge
